COURT OF APPEALS

EIGHTH DISTRICT OF
TEXAS

EL PASO, TEXAS


 
 
  
 JEANNIE COUTTA,
  
                            
 Appellant,
  
 v.
  
 THE STATE OF TEXAS,
  
                            
 Appellee.
 
 
  
   '
     
   '
     
   '
     
   '
     
   '
     
  '
 
  
 
 
  
  
                   No. 08-10-00039-CR
  
 Appeal from the
  
 243rd
 District Court
  
 of El
 Paso County, Texas
  
 (TC# 20040D01265)
  
 
 


 

O
P I N I O N

 

A jury found Appellant guilty of one count
of aggravated promotion of prostitution (Count I) and three counts of engaging
in organized criminal activity (Counts II-IV). 
The same jury assessed punishment at confinement of ten years for Count
I, seventeen years for Count II, two years each for Counts III and IV, and a
fine of $10,000 for each count.  Appellant
appeals her convictions.[1]  We affirm.

BACKGROUND

Appellant and her business partner, Phyllis
Woodall, owned and operated the Naked Harem, an adult-entertainment
establishment where patrons paid a cover charge for admission to be entertained
by totally-nude women.  For a $1 tip paid
to a dancer per song, a patron could sit by one of the stages and watch the
dancer on stage perform in the nude.  For
an additional $10 to $30, a patron could purchase a “table dance” or “lap
dance,” a term used interchangeably at trial to describe a dance in which the
dancer was closer and more intimate with the patron.  A patron could also purchase a private two-song
dance in one of four private rooms in the club for $130 cash or $140 if paid by
credit card.  A patron could purchase
additional songs if he wanted more time in the private room.

The dancers were independent contractors who
had to pay the club a “floor fee” for the privilege of dancing in the Naked
Harem.  They were not paid a salary.  The dancers kept all of the money that
patrons paid for stage and table dances, but they split with the Naked Harem the
money earned from private dances.  For the
two-song minimum private dances, the Naked Harem kept $50 if the patron paid in
cash, and kept $60 if the patron paid with a credit card.

The Naked Harem made most of its money from
the private dances because the dancers kept all of the money from their stage
and table dances and, thus, private dances were the “number one” priority of
the club.  Appellant and Woodall
encouraged dancers to perform more private dances rather than limiting their
performances to stage and table dances, and dancers who limited their dances
were viewed as being selfish and not making money for the club.

Appellant and Woodall were “hands-on” owners
and operators of the Naked Harem, were in control of the club and the
entertainment provided therein, performed managerial duties when needed, and
made all of the decisions regarding who performed duties at the club, including
decisions about the hiring and firing of dancers.  They made all of the rules and regulations
regarding activities at the club and if the managers had any questions, they
were required to obtain “permission” from Appellant and Woodall.  Appellant was physically present at the Naked
Harem about 85 percent of the time and, upon arriving at the club, would see
what needed to be done, perform general upkeep, and obtain updates from the
managers about the daily operations which included, among other things, information
regarding which dancers were making and producing the most money, “who was
doing what,” and who was causing trouble. 
The managers also discussed with Appellant and Woodall the daily ledgers
documenting the club’s revenues and sources thereof.

Appellant and Woodall had cameras installed throughout
the public areas of the club from which they could and did monitor club activities,
except those occurring within private rooms. 
Appellant and Woodall monitored the activities from within the club and
from home.  Appellant also had recording equipment
installed on the club’s telephones so that she could record and monitor the
phone conversations of employees and dancers to determine whether they were
speaking with police.

In addition to Appellant and Woodall, other
members of the combination identified in Counts II through IV of Appellant’s
indictment included Richard Hamm, Jacob Crum, Sandra “Tammy” Zepeda, and Maria
Brooks, who were employed as managers at the Naked Harem.  These managers were paid a percentage of the
club’s revenues and had a monetary stake therein.

While Appellant and Woodall handed down an
“official” policy that no sex or sexual contact was permitted within the club
or the private rooms, the rules enforced by Appellant, Woodall, and the
managers were very different.  Hamm, who
had been employed at the Naked Harem for approximately nine years, testified
that signs stating that sex was not permitted were not posted until “after the
warrant was issued,” and Crum, who had worked at the club for seven years,
similarly testified that the signs were posted after the first raids leading to
Appellant’s prosecution.

            Hamm testified
that during the table or lap dances performed on the main floor of the Naked
Harem, dancers would “grind” on the patron’s lap.  Crum likewise testified that in performing
such dances, the dancer would “grind” totally nude upon the patron, rubbing her
genitals against the patron for the patron’s sexual excitement.  Dancers and patrons testified that the
dancers would rub their genitals and breasts on the patron’s private parts and
allow patrons to touch their breasts, buttocks, and genitalia for the patron’s
sexual satisfaction.[2]  The sexual contact was visible to the club managers
and to Appellant and Woodall, who were also able to view the activities within
the club through the camera monitors.  A
video showing Appellant observing a sex show was introduced into evidence.

            Hamm and Crum
stated that Appellant and Woodall had established the “whole process of
prostitution” at the Naked Harem and that the owners and managers were aware
that prostitution was occurring in the private rooms of the club.  Hamm and Crum testified that they
specifically discussed with Appellant and Woodall the prostitution and sex
occurring within the private rooms.  Crum
testified that in one instance, in Appellant’s presence, he paid to have sex
with two dancers in one of the private rooms and Appellant commented, “[T]hat
was great.”  Crum acknowledged that
patrons were paying to have sex in the private rooms and testified that the
managers were aware of those activities.

            Francisco
Javier Cisneros had installed the phone and camera monitoring systems in the
Naked Harem.  Cisneros testified that he
had informed Appellant and Woodall that the dancers and patrons were having sex
in the private rooms but Appellant and Woodall would deny it.  Cisneros, without informing Appellant and
Woodall, placed cameras within the private rooms and recorded the activity
occurring therein.  Cisneros testified
that he never presented the recordings to Appellant and Woodall because he
figured the owners didn’t want the activity to stop.  Cisneros’ recordings of activity occurring within
the private rooms were introduced into evidence at trial.[3]  The recordings showed numerous sex acts.

            Patron
Donald Glines testified that he paid the Naked Harem for sex.  Glines said that when he paid for table or
lap dances, the dancers would rub their breasts and genitals on him for his
sexual gratification and some would ask if he wanted to go to the private room
and have sex.  On many occasions, Glines
paid the fee to go to the private rooms and during at least one-half to
two-thirds of those occasions, Glines engaged in sexual intercourse with the
dancer and would sometimes tip the dancer. 
On those occasions when he and the dancer did not have sexual intercourse,
the dancer would rub her genitals and breasts against him and he would touch
the dancer’s breasts and genitals.  David
Ruiz testified that he paid for oral sex in the private rooms at the Naked
Harem once or twice per year between 2001 and 2003, and had sex whether or not
he paid the dancer a tip.  Patron Jesus
Garcia visited the Naked Harem about once every three months from 2001 to 2003,
and testified that after paying for a table dance, some of the dancers would
ask if he wanted to have sex in a private room. 
Garcia did pay for sex in the private rooms at the Naked Harem and
testified that one of the club’s managers, Maria Brooks, would inform him when
there were new girls who wanted to go to the private rooms.[4]  The prior testimony of patron Jason Casper was
introduced at trial.  Casper testified
that he paid both for oral sex and to watch live sex shows in a private room at
the Naked Harem.

            Sylvia
Garcia was a dancer at the Naked Harem and testified that, on many occasions,
she had sex with a patron in a private room after he paid his fee for the
private dance.  Mary Snyder testified
that when she was a dancer at the club, she had sex in a private room with a
patron after he had paid his private-dance fee.

            Dancer Lucia
Pinedo testified that she was employed as a dancer at the Naked Harem when she
was 15 years old.  In deposition
testimony admitted at trial, Appellant admitted that she and Woodall had hired
Pinedo to work at the club, and Hamm testified at trial that Appellant brought
Pinedo to him and directed that he put Pineda on stage.  Hamm said Pinedo “looked pretty young” and
questioned her about her age.  Hamm
testified that Pinedo’s identification showed that she was of legal age but Pinedo
testified that she showed her high-school identification card, which does not
have her date of birth.  Crum, who stated
that Pinedo looked like a child and did not look 18 years old, testified that
when he discussed his concerns about Pinedo’s age with Appellant and Woodall,
they told him not to worry.  Pinedo
danced topless and totally nude during her performances and table and lap
dances.  She had sex with patrons in the Naked
Harem’s private rooms and, during the lap and table dances, patrons would touch
her breasts, buttocks, and “private parts.” 
When police first “raided” the club, Appellant, Hamm, and Crum destroyed
a video recording of Pinedo’s stage performance at the Naked Harem.

            Deserae
Williams Gurrola also danced nude on the stage and topless during lap dances at
the Naked Harem when she was 15 years old. 
During the lap and table dances, Gurrola would sit on and grind the
patron’s lap.  After Gurrola had become
popular in the club, manager Sandra “Tammy” Zepeda, grabbed Gurrola, told her
to “pretty up,” and escorted her to a VIP room where a doctor who was
patronizing the club had “bought her out,” meaning that he had paid for hours’
worth of songs.  On that occasion,
Gurrola and Zepeda’s daughter touched and rubbed each other and utilized sex
toys while the patron watched.  The doctor,
Gurrola, and Zepeda’s daughter then watched while another dancer and patron had
sex within the same room.  Gurrola made
approximately $2,000 for the evening and when Appellant and Zepeda paid Gurrola
in cash, Appellant informed Gurrola that Gurrola was going to make a lot of
money at the Naked Harem.  Crum testified
that he thought Gurrola’s identification resembled her and when he showed the
identification to Appellant, Appellant instructed him to allow Gurrola to
dance.  Gurrola testified that she spoke,
acted, and looked like a 15-year-old girl when she was dancing at the Naked
Harem and noted that any mature adult would have known the difference between
her and an 18 year old.

            The jury was
presented with other evidence regarding physical signs of sexual activity and
prostitution occurring at the Naked Harem.  Hamm testified that black lights within the
club would often show semen spattered all over the dancer’s body and Crum
testified that, after exiting the private rooms, male patrons were often seen
washing their penises in the men’s bathroom sink.  The jury heard testimony and saw photographic
evidence that used condoms were left in the private rooms, and were presented
with testimony that Appellant and Woodall conducted a meeting with the dancers
and club employees at which they instructed the dancers that they were not to
leave used condoms in the private rooms or else be subject to a $50 fine for
failing to clean up.  The dancers
complied with Appellant and Woodall’s instruction at the meeting to flush
condoms down the toilet so that police would not find them.  Because the flushing of used condoms created
plumbing problems at the Naked Harem, Appellant and Woodall had a special trap
installed in the sewer lines to catch the condoms.  The jury was presented with photographic
evidence of the condoms collected in the trap and thrown into a trash
receptacle near the trap.

DISCUSSION

In ten issues, Appellant complains: (1) that
she has been denied a meaningful and speedy appeal; (2) that the evidence is
insufficient to corroborate accomplice-witness testimony in Counts I through IV
of the indictment; (3) that the trial court committed jury-instruction error;
(4) that the evidence is legally insufficient to support her convictions for
Counts I and II; (5) that the trial court committed harmful error in
introducing a video recording; and (6) that the trial court committed
reversible error by excluding certain testimony.

SPEEDY APPEAL

            Appellant
asserts that she is entitled to a new trial because her appeal was excessively
delayed due to the court reporter’s failure to complete preparation of the
trial record for appellate purposes in violation of her Fourteenth-Amendment
right to a meaningful and speedy appeal, and contends that she has been substantially
prejudiced thereby.  We disagree.

            The trial
record in this case was due to be filed on April 10, 2010, and the filing of
the  14-volume reporter’s record was completed
on April 5, 2011.  Within that time frame,
Appellant’s counsel zealously pursued the filing of the reporter’s record, as
noted by the trial court, and we twice ordered the trial court to conduct
hearings to determine the status of the record. 
In each of those hearings, the trial court’s reporter explained under
oath her reasons for the delay, which were based upon the reporter’s heavy work
load and her own medical and health-related issues.  During the first of those hearings, the trial
court noted that the reasons for the delay involved the reporter’s health
issues and the trial court’s heavy docket, and that the trial court had
attempted to assist by relieving the reporter of some of her duties and by employing
a “roving” court reporter.  During the
second hearing, the trial court stated that it had changed the reporter’s
duties to allow her more time to work on preparing the record.  After each hearing, we granted extensions for
the filing of the reporter’s record, neither of which was met.  On March 2, 2011, the court reporter
requested an additional extension of time within which to prepare the record,
and on March 8, 2011, Appellant filed a Motion for New Trial Due to the Failure
of the Court Reporter to Timely File the Record on Appeal.  The following day, we denied Appellant’s
motion and ordered the trial court to conduct another hearing and take appropriate
action to ensure that the record was completed quickly.  We also directed that unless the trial court
appointed a substitute court reporter, the complete record was due by March 28,
2011, and noted that the court reporter would face possible citation for
contempt of court and reporting to the Court Reporter’s Certification Board for
failure to comply with the deadline.  The
trial court found that the reporter would be able to meet the deadline and stated
that it would take an active role and monitor the completion of the record.

            A convicted
defendant does not enjoy a Constitutional or Sixth Amendment right to a speedy
appeal.  See Phynes v. State, 828 S.W.2d 1, 2 (Tex.Crim.App. 1992); see also Rheuark v. Shaw, 628 F.2d 297,
302 (5th Cir. 1980), cert. denied,
450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981); Sparkman v. State, 634 S.W.2d 82, 84 (Tex.App.—Tyler 1982, no
pet.).  Texas, however, statutorily
provides a convicted defendant a right of appeal and the appellate process must,
therefore, comport with due-process requirements.  See
Rheuark., 628 F.2d at 302.

            No Supreme
Court decision holds that excessive delay in a direct appeal denies a criminal
appellant due process.  See Reed v. Quarterman, 504 F.3d 465,
485 (5th Cir. 2007).  We are guided,
however by the opinions of the Fifth Circuit and the Texas courts.  The Fifth Circuit has recognized that a court
reporter’s excessive delay in preparing the appellate record may deny due
process when the delay substantially retards the process of a criminal
defendant’s appeal.  See Rheuark, 628 F.2d at 302-303. 
However, not every delay, even an inordinate one, violates a convicted
defendant’s due process rights.  Rheuark, 628 F.2d at 302-303. 

            In
determining whether an appellate delay constitutes a violation of due process, our
inquiry is guided by the four speedy-trial factors set out by the Supreme Court
in Barker v. Wingo, 407 U.S. 514, 92
S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). 
See Rheuark, 628 F.2d at 303; United States v. Bermea, 30 F.3d 1539,
1569 (5th Cir. 1994), cert. denied,
514 U.S. 1097, 115 S.Ct. 1825, 131 L.Ed.2d 746 (1995).  Thus, we consider the length of the delay, the
reasons for the delay, Appellant’s assertion of his right to a speedy appeal,
and the prejudice to appellant caused by the delay.  See
Bermea, 30 F.3d at 1569; Rheuark,
628 F.2d at 303 n.8; Sparkman, 634
S.W.2d at 84.  The prejudice prong has
been identified as the most important factor of the test.  See
Bermea, 30 F.3d at 1569; see also
United States v. Antoine, 906 F.2d 1379, 1382 (9th Cir.), cert. denied, 498 U.S. 963, 111 S.Ct.
398, 112 L.Ed.2d 407 (1990).  Our
prejudice-factor analysis of the appellate delay focuses on three types of
possible prejudice: (1) oppressive incarceration during the pendency of appeal;
(2) the convicted defendant’s anxiety and concern while awaiting the outcome of
the appeal; and (3) impairment of the grounds for appeal or viability of
defenses in the event of reversal and retrial. 
See Bermea, 30 F.3d at 1569; Rheuark, 628 F.2d at 303 n.8.

            The one-year
delay of the preparation of the reporter’s record, while undesirable, did not
substantially retard the appellate process in this case and is not so excessive
as to weigh in favor of finding a due-process violation.  Bermea, 30 F.3d at 1569 (one
and one-half year delay in filing reporter’s record after convicted defendant
filed notice of appeal was not so excessive as to militate strongly in favor of
finding a due-process violation); compare
Antoine, 906 F.2d at 1382 (three-year delay, two years of which was
attributable to court reporter’s unwillingness or inability to produce the
trial record after convicted defendant paid for it, favored the convicted
defendant).  Moreover, the State
recognizes, as do we, that Appellant had no hand in the delay and that
responsibility rests almost exclusively with the trial court’s reporter.  Appellant’s appeal was not left to falter,
however.  Despite the trial court’s
“heavy” docket and the court reporter’s health and medical issues which form
the foundation of the delay, this Court, the trial court, and Appellant’s
counsel exercised their respective powers throughout the period of delay to
compel production of the reporter’s record for appeal and, ultimately, it was produced
and filed.  See Tex. R. App. P.
35.3(c); Johnson v. State, 151 S.W.3d
193, 196 (Tex.Crim.App. 2004) (identifying those steps which an appellate court
may take to compel a court reporter to prepare and file the record).  Consequently, we do not find that this factor
weighs heavily against the State.  Cf. Zamorano v. State, 84 S.W.3d 643,
649 (Tex.Crim.App. 2002).  Appellant
asserted her desire for a timely appeal after the court reporter filed her
second request for extension of time to file the record and thereafter pursued
the assertion of her right zealously.

            A violation
of due process cannot be established without a showing of prejudice to
Appellant.  Bermea, 30 F.3d at 1569.  Although
Appellant is ineligible for an appeal bond and has been incarcerated since her
conviction and sentencing, she no longer enjoys a presumption of innocence and
has not demonstrated that her convictions or sentences are improper.  Absent a showing that her incarceration is
oppressive or unjustified in light of the outcome of her appeal on the merits
or subsequent retrial, if any, we are unable to find that Appellant has been
subjected to oppressive incarceration pending her appeal.  See Tex. Code Crim. Proc. Ann. art.
44.04(b) (West 2006); see also United
States v. DeLeon, 444 F.3d 41, 59 (1st Cir. 2006) (because a convicted
defendant is no longer presumed innocent, it cannot be said that his
incarceration pending appeal is oppressive); Antoine, 906 F.2d at 1382 (a determination of whether a convicted
defendant’s “incarceration is unjustified and thus oppressive depends upon the
outcome of his appeal on the merits, or subsequent retrial, if any”).  It is within reason to state that a convicted
defendant who pursues appellate relief experiences some level of concern and
anxiety during the pendency of the appeal and we have no reason to distinguish
Appellant in this regard.  In fact, Appellant
does not discuss the anxiety or concern she has experienced other than making a
conclusory statement that she has “suffered immeasurable prejudice.”  Although some federal courts have recognized
that the anxiety factor is not particularly useful or compelling for purposes
of due-process analysis, Appellant has neither asserted nor demonstrated that
she has suffered a degree of particularized anxiety and concern which
differentiates her case from that of another appellant.  See
DeLeon, 444 F.3d at 59; Antoine,
906 F.2d at 1382-83.  Nor has Appellant
alleged or demonstrated that the delay of her appellate proceedings has
prejudiced any defense that she may wish to present should the outcome of her
appeal on the merits result in a reversal or retrial.  Where an appellant fails to show such
prejudice, we are unable to speculate that prejudice or impairment to her
defense exists.  Because we are unable to
conclude that Appellant has been prejudiced by the delay in her appellate
proceedings, we find the delay did not result in a violation of Appellant’s due
process rights.  Issue One is overruled.

Accomplice-Witness
Evidence and Legal-Sufficiency Issues

            In Issues
Two, Three, Four, and Five, Appellant challenges the sufficiency of
non-accomplice evidence to corroborate accomplice-witness evidence.  In Issue Six, Appellant complains that the
trial court erred when it failed to instruct the jury that certain State’s
witnesses were accomplice witnesses as a matter of law.  In her seventh and eighth issues, Appellant
asserts that the evidence was legally insufficient to support her convictions under
Counts II and I of the indictment, respectively.

            We first
review the elements of the charged offenses. 
The criminal offense of prostitution occurs when a person knowingly
offers to engage, agrees to engage, or engages in sexual conduct for a
fee.  Tex.
Penal Code Ann. § 43.02(a)(1)
(West 2011).  “Sexual conduct” includes:
(1) deviate sexual intercourse, which includes any contact between the genitals
of one person and the mouth or anus of another person; (2) sexual intercourse,
which means any penetration of the female sex organ by the male sex organ; and
(3) sexual contact, which means any touching of the anus, breast, or any part
of the genitals of another person with intent to arouse or gratify the sexual
desire of any person.  Tex. Penal Code Ann. § 43.01(1), (3), (4), (5) (West 2011).  Consequently, when a person engages in any
form of activity defined as “sexual contact” for a fee, he or she has committed
the offense of prostitution.  Tex. Penal Code Ann. § 43.01(3), § 43.02(a)(1) (West 2011).  “Sexual contact” need not be flesh-on-flesh
but may occur despite the existence of a cloth or other barrier which prevents
or impedes flesh-on-flesh contact.  See Steinbach v. State, 979 S.W.2d 836,
838-40 (Tex.App.–Austin 1998, pet. ref’d) (internal citations omitted).  A person commits the offense of aggravated
promotion of prostitution if she knowingly owns, invests in, finances,
controls, supervises, or manages a prostitution enterprise that uses two or
more prostitutes.  Tex. Penal Code Ann. § 43.04(a) (West 2011). 
In interpreting this language, the Texas Court of Criminal Appeals has
defined “prostitution enterprise” as “a plan or design for a venture or
undertaking in which two or more persons offer to, agree to, or engage in
sexual conduct in return for a fee . . . .” 
Taylor v. State, 548 S.W.2d
723, 723 (Tex.Crim.App. 1977). 
Aggravated promotion of prostitution is the offense alleged in Count I
and is the predicate offense in Count II of Appellant’s indictment.

            A person who
employs or authorizes a child to work in any place of business permitting,
requesting, or requiring the child to work nude or topless commits the offense
of employment harmful to children.  Tex. Penal Code Ann. § 43.251(b)(2)
(West 2011).  For purposes of Section
43.251 of the Texas Penal Code, “child” means a person who is younger than 18
years of age.  Tex. Penal Code Ann. § 43.251(a)(1) (West 2011).  Employment harmful to children is the
predicate offense alleged in Counts III and IV of Appellant’s indictment.

            A person
commits the offense of engaging in organized criminal activity if, with intent
to establish, maintain, or participate in a combination or in the profits of a
combination, she commits aggravated promotion of prostitution (Count II) or
employment harmful to children (Counts III and IV).  Tex.
Penal Code Ann. § 71.02(a)(3) & (7) (West 2011).  A “‘combination’ means three or more persons
who collaborate in carrying on criminal activities[.]”   Tex. Penal Code Ann. § 71.01(a) (West
2011).  Engaging in organized criminal
activity is the offense alleged in Counts II, III, and IV of Appellant’s
indictment.

            The
mental-state requirement of the offense of engaging in organized criminal
activity consists of two parts.  Hart v. State, 89 S.W.3d 61, 63
(Tex.Crim.App. 2002).  The first part
requires the State to prove the defendant had the requisite culpable mental
state to commit the predicate offense.  Tex. Penal Code Ann. § 71.02 (West
2011); Hart, 89 S.W.3d at 63.  The second part requires that the State prove
that the defendant committed the predicate offense with the intent to
establish, maintain, participate in, or participate in the profits of a
combination and that the members of the combination intended to work together
in a continuing course of criminal activity. 
Tex. Penal Code Ann. § 71.02
(West 2011); Hart, 89 S.W.3d at 63; Dowdle v. State, 11 S.W.3d 233, 236
(Tex.Crim.App. 2000).  This requires some
evidence of an agreement to act together in a continuing course of criminal
activity.  See Renteria v. State, 199 S.W.3d 499, 504 (Tex.App.–Houston [1st
Dist.] 2006, pet. ref’d); Pardue v. State,
252 S.W.3d 690, 700 (Tex.App.--Texarkana 2008, no pet.).

            Circumstantial
evidence may be and is often used to prove a person’s intent or knowledge as
direct evidence of the same may be scarce. 
See, e.g., Pardue, 252 S.W.3d at 702. 
Thus, circumstantial evidence may be used to prove, and a jury may infer
from the surrounding facts and circumstances, as here: (1) in support of a
finding that she committed the predicate offense of aggravated promotion of
prostitution, Appellant’s knowledge that prostitution was occurring at the
Naked Harem; (2) in support of a finding that she committed the predicate
offense of employment harmful to children, Appellant’s knowledge that Pinedo
and Gurrola were 15-year-old dancers employed to dance topless or nude in the
Naked Harem; (3) Appellant’s intent to participate in a combination; and (4)
the agreement of the combination members to act together in carrying out
criminal activities.  See Hart, 89 S.W.3d at 64; Armentrout v. State, 645 S.W.2d 298, 301
(Tex.Crim.App. 1983); Pardue, 252
S.W.3d at 701-02; Ledet v. State, 177
S.W.3d at 213, 218-19 (Tex.App.–Houston [1st Dist.] 2005, pet. ref’d); Munoz v. State, 29 S.W.3d 205, 209
(Tex.App.—Amarillo 2000, no pet.).

            A conviction
may not be had upon the testimony of an accomplice unless that testimony is
corroborated by other non-accomplice witness evidence that tends to connect the
defendant to the crime.  Tex. Code Crim. Proc. Ann. art. 38.14
(West 2005).  “An accomplice is someone
who participates with the defendant before, during, or after the commission of
a crime and acts with the required culpable mental state.”  Druery
v. State, 225 S.W.3d 491, 498 (Tex.Crim.App.), cert. denied, 552 U.S. 1028, 128 S.Ct. 627, 169 L.Ed.2d 404 (2007);
see also Paredes v. State, 129 S.W.3d
530, 536 (Tex.Crim.App. 2004).  This
participation must include an affirmative act in promotion of the commission of
the offense with which the defendant is charged.  See
Druery, 225 S.W.3d at 498; Paredes,
129 S.W.3d at 536.  A witness is not an
accomplice as a matter of law merely because the witness knew of the offense
and did not disclose it, or even if the witness concealed the offense.  See
Druery, 225 S.W.3d at 498.

            When the
evidence is clear and shows that there is no doubt that a witness is an
accomplice as a matter of law, the trial court is required to instruct the jury
accordingly.  Smith, 332 S.W.3d at 439.  “A
witness who is indicted for the same offense or a lesser-included offense as
the accused is an accomplice as a matter of law.”  Smith
v. State, 332 S.W.3d 425, 439 (Tex.Crim.App. 2011).  Thus, if the participant witness has been
charged with the offense or with a lesser-included offense, the trial court
should instruct the jury that the witness is an accomplice as a matter of
law.  Druery,
225 S.W.3d at 498.  When the evidence is
conflicting regarding a witness’s status as an accomplice, the trial court may
instruct the jury to determine the witness’s status as a fact issue.  Smith,
332 S.W.3d at 439-40.  When the evidence
is clear and shows that a witness is not an accomplice, the trial court is not
required to provide an accomplice-witness instruction.  Smith,
332 S.W.3d at 440.

            An immunity
agreement is directly relevant to determining whether a witness is an
accomplice as a matter of law.  Jones v. State, 195 S.W.3d 279, 290 n.12
(Tex.App.–Fort Worth 2006), aff’d,
235 S.W.3d 783 (Tex.Crim.App. 2007).  However,
the grant of transactional immunity to a witness does not automatically render
the witness an accomplice as a matter of law. 
See Moulton v. State, 508 S.W.2d
833, 836 (Tex.Crim.App. 1974); Jester v.
State, 62 S.W.3d 851, 855 (Tex.App.–Texarkana 2001, pet ref’d); Jarnigan v. State, 57 S.W.3d 76, 91
(Tex.App.–Houston [14th Dist.] 2001, pet ref’d).

Jury Charge Error

            We commence
our analysis by examining Issue Six relating to the alleged jury-charge
error.  It is undisputed that Richard
Hamm and Jacob Crum were clearly accomplices as a matter of law.  The issues to be resolved are whether the patron
witnesses, dancer witnesses (other than Gurrola), and Cisneros were accomplices
as a matter of law and whether the trial court was required to instruct the
jury that they were accomplices as a matter of law.  Appellant contends that all of these
witnesses were accomplices as a matter of law to the charged offenses.

            We first
determine whether a witness was an accomplice to the distinct offenses alleged
in each count of Appellant’s indictment. 
A conviction for aggravated promotion of prostitution as alleged in
Count I may be had upon the uncorroborated testimony of a party to the offense.  Tex. Penal
Code Ann. § 43.06(d) (West 2011); Taylor,
548 S.W.2d at 723.  Consequently,
Appellant cannot show that the trial court erred by failing to include
accomplice-witness instructions regarding any witness as to Count I.  In fact, the trial court erred by failing to
exclude Count I from the accomplice-witness instruction submitted regarding
Hamm and Crum.  This portion of Appellant’s
sixth issue is overruled.

            Although
Cisneros was aware of prostitution activities occurring within the private
rooms at the Naked Harem, had informed Appellant and Woodall that prostitution
was occurring within the private rooms, and surreptitiously recorded the
prostitution activities, there is no evidence that Cisneros encouraged
prostitution.  Nor does the record show
or suggest that Cisneros knew that Gurrola was dancing at the Naked Harem or
was underage.  Moreover, Hamm’s destruction
of a video showing Pinedo dancing at the club did not render Cisneros an
accomplice as a matter of law to Appellant’s unlawful hiring of Pinedo to dance
topless and nude at the club.  See Druery, 225 S.W.3d at 498 (a witness
is not an accomplice as a matter of law simply because he knew of the offense
and did not disclose it, or even if he concealed it).  As a result, Appellant has failed to show
that Cisneros was susceptible to prosecution for any of the offenses for which
Appellant was charged or that Cisneros in any way promoted, assisted, or had
any specific intent to aid Appellant in the commission of those offenses.  That Cisneros was granted transactional
immunity from prosecution for a different offense than that with which
Appellant was charged does not transform him into an accomplice witness.  See
Moulton, 508 S.W.2d at 836; Jester,
62 S.W.3d at 855; Jarnigan, 57 S.W.3d
at 91.  Consequently, Cisneros was not an accomplice witness
as a matter of law to Counts II, III, and IV. 
See Druery, 225 S.W.3d at 498.  In fact, because Cisneros was not an
accomplice as a matter of law, his testimony could be used to corroborate
Hamm’s and Crum’s accomplice-witness testimony as to these counts.  Tex.
Code  Crim. Proc. Ann. art. 38.14
(West 2005).  Appellant has failed to
show that Cisneros was an accomplice as a matter of law to any of the offenses
for which she was charged and, as a result, has failed to show that the trial
court committed error when it did not instruct the jury that Cisneros was an
accomplice witness as to Counts II, III, and IV.  We overrule these portions of Issue Six.

            The underage-dancer
witnesses identified in Count III (Pinedo) and Count IV (Gurrola) of
Appellant’s indictment were not susceptible to prosecution for employment
harmful to children and cannot be considered accomplices to Appellant’s
commission of those offenses.  The clear
intent of Texas Penal Code, section 43.251, which comprises the
employment-harmful-to-children statute, is to prevent the exploitation of
children under the age of 18 years in the adult-entertainment industry.  Tex.
Penal Code Ann. § 43.251 (West 2011). 
Section 43.251 implicitly mandates that a child’s “consent” to
employment in a sexually-oriented commercial activity or in any place of
business permitting, requesting, or requiring a child to work nude or topless
is no defense to prosecution thereunder, as the child’s consent to such
employment is not legally operative.  Cf. Scoggan v. State, 799 S.W.2d 679, 681
(Tex.Crim.App. 1990); Tyrone v. State,
854 S.W.2d 153, 155-56 (Tex.App.–Fort Worth 1993, pet. ref’d) (cases explaining
that a child may not provide legally-operative consent to sexual intercourse;
because the child may never be an accomplice to the rape of the child, the
child-victim’s uncorroborated testimony can support a defendant’s conviction
for statutory rape).  Pinedo and Gurrola
cannot be accomplices under section 43.251. 
In fact, their testimony could be used to corroborate Hamm’s and Crum’s
accomplice-witness testimony as to Counts III and IV, respectively.  Thus, the trial court did not err when it
failed to instruct the jury that Pinedo and Gurrola were accomplices as a matter
of law as to Counts III and IV, respectively. 
We overrule this portion of Issue Six.

            Although other
non-underage dancers and club patrons who testified at trial acknowledged
engaging in acts of prostitution at the Naked Harem, there is no evidence that such
prostitution involved either Pinedo or Gurrola, and none of the testimony from
those witnesses suggested that they aided, encouraged, or promoted Appellant’s
hiring or allowing Pinedo or Gurrola to work at the Naked Harem.  No evidence suggested that any of the testifying
non-underage dancer- or patron-witnesses were susceptible to prosecution for
the offenses of employment harmful to children or engaging in organized
criminal activity by employment harmful to children.  Because Appellant has failed to show that any
of these witnesses were accomplices as a matter of law as to Counts III and IV
respectively, we overrule this portion of Issue Six.

            The State
agrees that the dancer- and patron-witnesses were susceptible to prosecution
for prostitution but does not concede that prostitution is a lesser-included
offense of the offenses of aggravated promotion of prostitution and engaging in
organized criminal activity by aggravated promotion of prostitution (Count II).  The State does agree, however, that if the
dancers and patrons were accomplices as a matter of law, the trial court erred
when it failed to instruct the jury regarding Count II, which charged Appellant
with engaging in organized criminal activity by aggravated promotion of
prostitution.  In conducting a harm
analysis of a failure to properly provide an accomplice-witness instruction, the
Texas Court of Criminal Appeals has instructed that we are to consider the
purpose and intended effect of article 38.14. 
Tex. Code Crim. Proc. Ann.
art. 38.14 (West 2005); see Herron v.
State, 86 S.W.3d 621, 631-32 (Tex.Crim.App. 2002) (the instruction merely
informs the jury that accomplice-witness testimony cannot be used absent
non-accomplice evidence connecting defendant to the offense, and once it is
determined that non-accomplice evidence exists, the instruction’s purpose is
fulfilled; non-accomplice evidence can render a trial court’s failure to
instruct harmless by fulfilling the purpose the instruction is designed to
serve.); see also Cocke v. State, 201
S.W.3d 744, 747 (Tex.Crim.App. 2006), cert.
denied, 549 U.S. 1287, 127 S.Ct. 1832, 167 L.Ed.2d 332 (2007).  Because Appellant failed to object to the
trial court’s charge or to request any accomplice-witness-as-a-matter-of-law
instruction, she must show egregious harm. 
See Herron, 86 S.W.3d at
631-34.  Under the egregious harm
standard, the omission of an accomplice-witness instruction is generally
harmless unless the corroborating non-accomplice evidence is “so unconvincing
in fact as to render the State’s overall case for conviction clearly and
significantly less persuasive.”  See Herron, 86 S.W.3d at 632, quoting Saunders v. State, 817 S.W.2d
688, 692 (Tex.Crim.App. 1991).

            When we
review the sufficiency of corroborating evidence under article 38.14, we must
eliminate from consideration any testimony by an accomplice witness and then
examine the remaining evidence to determine whether there is any evidence that
tends to connect the defendant to the commission of the offense.  Tex.
Code Crim. Proc. Ann. art. 38.14; see
Malone v. State, 253 S.W.3d 253, 257 (Tex.Crim.App. 2008).  The non-accomplice evidence need not
corroborate the accomplice testimony as to every element of the charged
offense.  See Joubert v. State, 235 S.W.3d 729, 731 (Tex.Crim.App. 2007) (no
requirement that non-accomplice evidence corroborate defendant’s connection to
a specific element that elevates an offense from murder to capital murder).  Nor must the corroborating evidence by itself
prove the defendant’s guilt beyond a reasonable doubt.  Malone,
253 S.W.3d at 257.  Rather, all that is
required is that some non-accomplice corroborating evidence links the accused
in some way to the offense and shows that “rational jurors could conclude that
this evidence sufficiently tended to connect [the accused] to the
offense.”  See Malone, 253 S.W.3d at 257, quoting
Hernandez v. State, 939 S.W.2d 173, 179 (Tex.Crim.App. 1997).  In determining the sufficiency of the
corroborating evidence, we view the non-accomplice testimony in a light most
favorable to the verdict.  Hernandez, 939 S.W.2d at 179.

            The
testimony of Hamm, Crum, the dancers, and the patrons is sufficient to
establish that the Naked Harem was a “prostitution enterprise.”  Tex.
Penal Code Ann. § 43.04(a)
(West 2011); Taylor, 548 S.W.2d at
723.  We also find that the corroborating
non-accomplice evidence is sufficient to show that Appellant owned, invested
in, financed, controlled, supervised, or managed the prostitution enterprise at
the Naked Harem.

            In a
television interview, Appellant acknowledged owning and operating the Naked
Harem along with Woodall and stated that she would do anything to see that the
Naked Harem made money.  In her
deposition, Appellant acknowledged that she and Woodall had personally hired an
underage dancer, Pinedo, to work at the Naked Harem.  Ledgers detailing the Naked Harem’s revenues
were found in the trash at Appellant’s and Woodall’s residence and a police
department financial analyst testified that the Naked Harem had processed more
than $850,000 in credit-card purchases (excluding cash transactions) at the
club between 2001 and 2003.  The physical
evidence at the Naked Harem, including the video showing Appellant watching
dancers perform a sex show on the main stage of the club, the numerous used
condoms and condom wrappers found in the private rooms of the club, and the
traps that were installed to filter the flushed condoms from the club’s sewer
lines suggest that Appellant, as an owner and operator of the Naked Harem was
aware of the illicit sexual activity occurring there.  Cisneros’ testimony showed that Appellant and
Woodall, if they did not already know, were informed that sex acts were
occurring in the Naked Harem, that Appellant was aware of the condoms in the
private rooms and of the other objective indicators of prostitution in the
club, and that after a police raid, Appellant observed Hamm destroy a video
recording of 15-year-old Pinedo dancing on stage at the club.  By camera, Appellant monitored activities at
the Naked Harem from her office and home and recorded the club’s telephones to
monitor whether the employees were communicating with police but directed
Cisneros not to install cameras in the private rooms to prevent the
blackmailing of the patrons who used those rooms.

            From this
evidence, the jury could have inferred that Appellant was actually aware of and
permitted the prostitution to occur at the Naked Harem.  When viewed in the light most favorable to
the verdict, this non-accomplice evidence tended to connect Appellant to the prostitution
enterprise within the Naked Harem in that it tended to show that she owned,
invested in, financed, supervised, or managed the Naked Harem where the
prostitution was occurring.  See Pardue, 252 S.W.3d at 701-04 (non-accomplice
evidence that the accused managed and operated a game room where illegal
gambling activities occurred and gave instructions to game-room employees was
sufficient to corroborate accomplice-witness testimony describing the illegal
activities); see also Williams v. State,
47 S.W.3d 626, 631 (Tex.App.–Waco 2001, pet. ref’d) (accused’s out-of-court
statements can be a source of non-accomplice evidence); Medina v. State, 7 S.W.3d 633, 642-43 (Tex.Crim.App. 1999), cert. denied, 529 U.S. 1102, 120 S.Ct.
1840, 146 L.Ed.2d 782 (2000) (accused’s
veiled admissions sufficient to connect accused to offense).  In light of the corroborating non-accomplice
evidence tending to connect Appellant to these offenses, the trial court’s
error in failing to properly instruct the jury on the accomplice-witness rule
was harmless as to Count II.  See Herron, 86 S.W.3d at 631-34; Medina, 7 S.W.3d at 641-43; Williams, 47 S.W.3d at 631-32.  This portion of Issue Six is overruled.

            As to Counts
III and IV, wherein Appellant was charged with engaging in organized criminal
activity by employment harmful to children, the non-accomplice corroborating testimony
of Pinedo and Gurrola that each was underage and dancing nude and topless at
the Naked Harem is sufficient to corroborate the testimony of Hamm and Crum.  Hamm’s and Crum’s accomplice testimony was
sufficient to establish that Appellant had committed the offense of employment
harmful to children.  Tex. Penal Code Ann. § 43.251(b)(2) (West
2011).  The non-accomplice evidence
showed that Appellant encouraged underage Gurrola to continue dancing at the Naked
Harem because Gurrola was going to make a lot of money.  Appellant also admitted hiring Pinedo and was
present during the destruction of the video which showed Appellant watching
Pinedo working at the Naked Harem.  This
non-accomplice evidence, when combined with the other non-accomplice evidence connecting
Appellant to the ownership, operation, supervision, and management of the Naked
Harem, tended to connect Appellant to the offenses set forth in Counts III and
IV.  See
Medina, 7 S.W.3d at 642-43; Williams,
47 S.W.3d at 631; see also Guevara v.
State, 152 S.W.3d 45, 50 (Tex.Crim.App. 2004) (an attempt to conceal
incriminating evidence is probative of wrongful conduct and is a circumstance
of guilt).

            Because the
non-accomplice evidence was ample and more than sufficient to connect Appellant
to all of the charged offenses in Counts I through IV, the trial court’s error in
failing to instruct the jury that any of the complained-of witnesses were accomplices
to a particular offense was harmless.  We
overrule Issue Six in its entirety.

Sufficiency of the Corroborating Evidence

            We next
address Issues Two, Three, Four, and Five, in which Appellant complains that
the non-accomplice evidence was insufficient to corroborate the testimony of Cisneros
and the State’s dancer- and patron-witnesses as to each respective count in the
indictment.

            Appellant’s
second issue challenges the sufficiency of the non-accomplice evidence to
corroborate the accomplice-witness testimony regarding Count I.  Again, because a conviction for aggravated
promotion of prostitution as charged in Count I may be supported by the
uncorroborated testimony of a party to the offense, Appellant’s second issue is
overruled.  Tex. Penal Code Ann. § 43.06(d) (West 2011); Taylor, 548 S.W.2d at 723-24.

            Issues Three,
Four, and Five raise the same sufficiency of non-accomplice evidence challenges
regarding Counts II, III, and IV, respectively, as raised in Issue Two.  As we addressed in Issue Six, Appellant’s own
statements and testimony, the testimony of Pinedo, Gurrola, and Cisneros, and
the physical evidence presented at trial, showed her ownership and involvement
in and at the Naked Harem, which was shown to be a prostitution enterprise, and
tended to connect Appellant to each of the charged offenses in Counts II, III,
and IV.  The jury’s implicit rejection of
Appellant’s defensive postures of plausible deniability and ignorance was
reasonable in light of the sufficient non-accomplice-witness evidence which
permitted the jury to reasonably infer and conclude that Appellant knew of the
prostitution activity and intended to work together with co-owner Woodall and
the Naked Harem’s managers to promote the prostitution activities and the
employment of underage topless and nude dancers, Pinedo and Gurrola.  Issues Three, Four, and Five are overruled.

Legal-Sufficiency Challenge

            Issues Seven
and Eight challenge the legal sufficiency of the evidence to support Appellant’s
convictions for engaging in organized criminal activity by aggravated promotion
of prostitution (Count II) and aggravated promotion of prostitution (Count I),
respectively.  We review the legal
sufficiency of the evidence to support a conviction in the light most favorable
to the verdict, and reverse the conviction only if no rational trier of fact
could have found that the State had met its burden of proving each element of
the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 99
S.Ct. 2781, 61 L.Ed.2d 560 (1979).

            As we have
determined that the non-accomplice witness evidence was sufficient to connect
Appellant to the offenses alleged in Counts I and II of the indictment, we
review all of the evidence, including the accomplice-witness testimony of Hamm
and Crum and the non-accomplice witnesses, to determine the sufficiency of the
evidence to support Appellant’s convictions for Counts I and II.

            That
evidence, including Cisneros’ surreptitiously recorded video, demonstrated that
numerous dancers were performing acts of prostitution in the private rooms at
the Naked Harem, and that the Naked Harem constituted a prostitution enterprise.  Appellant and Woodall owned and operated the
prostitution enterprise and, although they denied to Cisneros that prostitution
was occurring, the collective evidence showed that Appellant knew and had been
told about the prostitution, that Appellant viewed prostitution occurring
firsthand between Crum and the two dancers whom he paid to have sex, that
specific discussions occurred between Appellant, Woodall, Crum, and Hamm about prostitution
and sex occurring in the private rooms, and that Appellant and Woodall had established
the “whole process” for prostitution to occur within the Naked Harem.  Evidence similar to the quality and quantity
present in this record has been held sufficient to support the convictions of owner-operators
of adult entertainment business for aggravated promotion of prostitution.  See,
e.g., Armentrout, 645 S.W.2d at 299-302; Ringer v. State, 577 S.W.2d 711, 713-16 (Tex.Crim.App. 1979); Taylor, 548 S.W.2d at 723-25; Smithwick v. State, 762 S.W.2d 232, 233-34
(Tex.App.—Austin 1988, pet. ref’d); Brownwell
v. State, 644 S.W.2d 862, 863-65 (Tex.App.—Tyler 1982, no pet.).  We find the evidence is sufficient to permit
a jury to infer that Appellant was in the business of promoting prostitution.

            With regard
to the requirement that the State prove that Appellant committed the predicate
offense with the intent to participate in a combination with Woodall and the
managers of the Naked Harem, the quality and quantity of the evidence in the
record before us has likewise been held sufficient to prove the combination
element of the engaging statute.  See Pardue, 252 S.W.3d at 699-704.  Evidence that a defendant was the leader of
an organization that functioned as the alleged combination and was involved in
planning the organization’s activities is sufficient to prove that the
defendant encouraged, directed, aided, or attempted to aid in the commission of
the predicate offense of the combination and is sufficient to support a
conviction for engaging in organized criminal activity.  See
Otto v. State, 95 S.W.3d 282, 284-85 (Tex.Crim.App. 2003).  While Appellant emphasizes that there was no
evidence of a formal agreement between Appellant, her co-owner Woodall, and
managers Hamm, Crum, Zepeda, and Brooks to run a prostitution enterprise,
circumstantial evidence may be used to prove the state of mind required to
support Appellant’s conviction.  See Munoz, 29 S.W.3d at 209.  Such circumstantial evidence may also be used
to prove the existence of an agreement to work together in continuing criminal
activities.  See Munoz, 29 S.W.3d at 209; Hart,
89 S.W.3d at 64.

            Sufficient
circumstantial evidence showed that prostitution was occurring at the Naked
Harem when Appellant, Woodall, Crum, Hamm, Zepeda, and Brooks were managing and
operating the club.  From all of the
direct and circumstantial evidence of Appellant’s knowledge of, and together
with the named combination members, promotion of prostitution at the Naked
Harem, the jury was rationally justified in rejecting Appellant’s claims of
ignorance that prostitution was occurring at the club and was not required to
accept Appellant’s defense.  See Agripino v. State, 217 S.W.3d 707,
716 (Tex.App.–El Paso 2007, no pet.).

            Viewed in a
light most favorable to the verdict, we find it was reasonable for the jury to
have found beyond a reasonable doubt that Appellant was engaged in the
aggravated promotion of prostitution and that Appellant agreed to work in
conjunction with Woodall, Crum, Hamm, Zepeda, and Brooks as set forth in the
indictment to run a prostitution enterprise.  Issues Seven and Eight are overruled.

Alleged
Trial Court Error

Admission of Video Evidence

            In Issue Nine, Appellant contends
the trial court committed harmful error when it allowed the State to introduce
Cisneros’ silent video recordings of sexual acts occurring between dancers and
patrons in a private room at the Naked Harem. 
Appellant specifically contends that she did not “open the door” to the
introduction of the video recordings, that the recordings were not relevant and
were unfairly prejudicial, and that admission of the video recordings was
harmful.

            During or
prior to her first trial (which resulted in a mistrial), Appellant had filed a
“motion in limine” asking that the State approach the bench before mentioning
or offering into evidence the surreptitious video recordings of sexual acts
occurring at the Naked Harem.[5]

            At a
pretrial hearing held in advance of Appellant’s retrial, the trial court noted
that it was granting Appellant’s motion to suppress “the electrician video.”  At a subsequent pretrial hearing, the State indicated
its intent to file a motion seeking the trial court’s reconsideration of its ruling
based on an alleged absence of privacy interest by Appellant in the private
rooms of the Naked Harem that were open to the public, but no such motion was
filed.

            During
Appellant’s opening statement at the second trial, defense counsel proffered
that if acts of prostitution were occurring in the Naked Harem, the dancers
were receiving the money directly and Appellant and the club did not enjoy the
profits of the prostitution activity.  On
cross-examination, after Hamm had testified on direct examination about the
sexual activity in the private rooms at the Naked Harem as well as Appellant’s
awareness and knowledge thereof, defense counsel elicited testimony from Hamm
that when a patron purchased a two-song dance in a private room, sex was not
guaranteed, that the dancers could negotiate additional pricing for sex, and
that the club’s cut of the two-song minimum fee provided access to the private
room.  Hamm also testified that Appellant
had informed him that the club’s attorney had said “that a patron could
masturbate as long as a dancer wasn’t being touched.”  Defense counsel attempted to elicit testimony
from Hamm that the dancers would not be having sex for only $80 of their portion
of the private dance fee and that some additional negotiation between the
dancer and patron would have occurred when the trial court sustained the
State’s speculation objection:

Defense Counsel:        I
mean, what I’m saying is, if there’s 130 or $40.00 [sic] involved, and they’re
going to get 80 – 

 

.    .    .

 

                                    --it
would seem that there would be some negotiation between them, would it not?

The State:                   Object to speculation, Your
Honor.

The Court:                  Sustained.

 

The State contended that Appellant had
“opened the door” to allow the admission of Cisneros’ video recordings of sex
acts that occurred in one of the Naked Harem’s private rooms into evidence to
rebut counsel’s implications that the dancers were negotiating and charging
extra for sex in the private rooms.   Defense counsel countered that because the
recordings were silent, it was impossible to determine whether negotiations or
payment occurred before or after the dancer and patron entered the private
room.  The trial court stated that it was
inclined to believe that if the video recordings showed no exchange of money,
the video records would be relevant to rebut defense counsel’s suggestions that
the dancers were negotiating additional money for sex, and the court further
noted that while the video recordings may fall short of conclusively proving
that no further negotiation or exchange of money occurred, absolute proof was
unnecessary before the recorded evidence would be relevant in proving the fact.

            Defense
counsel again raised the possibility that dancers were negotiating extra fees
for sex when cross-examining Crum, who testified that he assumed that the
dancers and patrons were always having sex in the private rooms, that because he
wasn’t present in the private rooms, he could not be certain that every
encounter resulted in sex, and agreed that some customers complained that they
did not get what they expected.  Crum
also testified that upon cleaning the private rooms, he could tell that the
condoms had been used but did not know if the condoms containing semen resulted
from sexual contact or from masturbation.  Crum explained under cross-examination that
Woodall had informed him that a patron could legally masturbate in a private
room as long as he was not touching the dancer.

            Cisneros
testified on direct examination that Appellant and Woodall had asked him to
install cameras in all areas of the club except the private rooms and also
asked Cisneros to check for hidden cameras in the private rooms that Appellant
and Woodall believed police may have installed. 
Without objection, Cisneros also testified that he had installed a
camera in one of the private rooms without being requested to do so by
Appellant and Woodall and had made video recordings of activity occurring
between dancers and patrons in that room between April 12 and April 16, 2001,
as well as other times.

            Defense
counsel objected when the State offered the Cisneros video recordings into
evidence, arguing that the trial court had already ruled the recordings were
inadmissible, and that he had not opened the door to admission of the silent recordings
through the eliciting of cross-examination testimony about “negotiations” and
used condoms.  The trial court overruled
defense counsel’s objections, noting that the “negotiation issue, the condom
issue and whether or not sex was the norm . . . are three issues that . . . I
think opened the door.”  The video was
admitted into evidence and Cisneros testified that the video showed the dancers
and patrons having sex in the private room.

             We do not disturb a trial court’s decision to
admit evidence absent an abuse of discretion. 
See Ramos v. State, 245 S.W.3d
410, 417-18 (Tex.Crim.App. 2008); Winegarner
v. State 235 S.W.3d 787, 790 (Tex.Crim.App. 2007); Torres v. State, 71 S.W.3d 758, 760 (Tex.Crim.App. 2002); Flores v. State, 299 S.W.3d 843, 856
(Tex.App.–El Paso 2009, pet. ref’d).  When
the trial court’s ruling is within the zone of reasonable disagreement, is
reasonably supported by the record, and is correct under any theory of law
applicable to the case, it must be upheld. 
State v. White, 306 S.W.3d
753, 757 n.10 (Tex.Crim.App. 2010); Ramos,
245 S.W.3d at 418; Torres, 71 S.W.3d
at 760; Flores, 299 S.W.3d at 856.  This is true even when the trial court gives
the wrong reason for its decision.  Romero v. State, 800 S.W.2d 539, 543 (Tex.Crim.App.
1990).

            Evidence
that is otherwise inadmissible may become admissible if a party “opens the
door” to such evidence.  Williams v. State, 301 S.W.3d 675, 687
(Tex.Crim.App. 2009), cert. denied, ___
U.S. ___, 130 S.Ct. 3411, 177 L.Ed.2d 326 (2010).  Appellant opened the door to the admission of
Cisneros’ video by her opening statement, in which she proffered a defensive
theory that if the dancers were committing prostitution, Appellant and the
Naked Harem did not realize profits from that activity because the dancers were
receiving the money directly from the patrons. 
See Bass v. State, 270 S.W.3d
557, 563 (Tex.Crim.App. 2008) (defendant’s opening statement may open the door
to otherwise inadmissible evidence to rebut a defensive theory presented in
that opening statement); see also Gaytan
v. State, 331 S.W.3d 218, 225 (Tex.App.–Austin 2011, pet. ref’d) (if
opening statement presents a defensive theory, it opens the door to rebuttal
evidence).  The video recordings show
that no exchange of money occurred between the dancers and patrons in the
private room in addition to the patron’s up-front payment of the fee to the
club to gain admission to the private room, and was directly relevant in
rebutting Appellant’s defensive theory proffered during her opening statement.  See
also Stewart v. State, 129 S.W.3d 93, 96 (Tex.Crim.App. 2004) (evidence
need only provide small nudge toward proving or disproving a fact).

            Appellant
also opened the door to the admission of Cisneros’ video recordings through her
cross-examination of the State’s witnesses by suggesting that the dancers were
negotiating their own price for sex in the private room in addition to the
Naked Harem’s fee for the “private dance,” and by suggesting that the used
condoms and semen in the private room were the result of patrons masturbating
in the private room.  See Wells v. State, 319 S.W.3d 82, 94
(Tex.App.–San Antonio 2010, pet. ref’d); Houston
v. State, 208 S.W.3d 585, 591 (Tex.App.–Austin 2006, no pet.) (defense
counsel’s cross-examination of a State’s witness that leaves a false impression
as to some fact may open the door to admission of otherwise inadmissible
evidence to correct the false impression). 
Appellant’s cross-examination created the impression that sex was not the
norm when a dancer and a patron entered a private room, that any dancers who
were committing acts of prostitution were negotiating and charging extra fees
for the activity, and that used condoms and semen that were present in the private
rooms were the result of patrons masturbating. 
Such implications authorized the State to reply by seeking the admission
of Cisneros’ video recordings which showed no exchange of money between the
dancers and patrons in the private room either before, during, or after they
had sex, rather than patrons merely masturbating.  Appellant’s cross-examination of the State’s
witnesses also elicited speculation about what may have been occurring within
the private rooms and opened the door to admit the video recordings for the
purpose of showing exactly what was happening between dancers and patrons
therein.  See Cameron v. State, 988 S.W.2d 835, 847 (Tex.App.–San Antonio
1999, pet. ref’d) (defendant’s testimony regarding events regarding car bombing
opened the door to admission of video recording showing the car bombing, even
though the trial court had previously ruled the recording to be inadmissible).  Consequently, Appellant has failed to show
that the trial court erred or abused its discretion by determining that she
opened the door to the admission of the Cisneros video recordings.

            We disagree
with Appellant’s contention that the video recordings showing sex acts between
dancers and patrons were not relevant.  Evidence
is relevant if it tends to make the existence of any consequential fact more or
less probable than it is without the evidence.  Tex. R.
Evid. 401; Goldberg v. State,
95 S.W.3d 345, 366 (Tex.App.–Houston [1st Dist.] 2002, pet. ref’d), cert. denied, 540 U.S. 1190, 124 S.Ct.
1436, 158 L.Ed.2d 99 (2004).  To be
relevant in proving a fact, evidence need not prove the fact but it is
sufficient if the evidence provides a small nudge toward proving or disproving some
fact of consequence.  Kirsch v. State, 306 S.W.3d 738, 743
(Tex.Crim.App. 2010), citing Stewart v.
State, 129 S.W.3d 93, 96 (Tex.Crim.App. 2004).

            The video
alone need not show that the Naked Harem was a prostitution enterprise before
it could be found relevant.  See Stewart, 129 S.W.3d at 96.  Hamm and Crum each testified that dancers and
patrons were not permitted to enter private rooms until the patron had paid the
required fee.  The video recordings about
which Appellant complains show, as Cisneros described, dancers and patrons
having sex in the private room.  The
video thus tended to show that the Naked Harem was a prostitution enterprise
and was relevant to the charged offenses. 
See Tex. R. Evid. 401; Tex.
Penal Code Ann. 43.04(a) (West 2011).

            Appellant
attempts to argue on appeal that probative value of the video recordings were substantially
outweighed by a danger of unfair prejudice under Rule 403.  Tex. R.
Evid. 403.  Appellant raised a
Rule 403 objection in her motion in limine in her first trial but sought only
to have the State approach the bench before mentioning or offering the video
recordings in this trial.  A motion in
limine is a preliminary matter which does not preserve any complaints for
appellate review and, to preserve such complaint, a party must object at the
time the complained-of evidence is offered at trial.  Tex.
R. App. P. 33.1(a); see Fuller v.
State, 253 S.W.3d 220, 232-33 (Tex.Crim.App. 2008), cert. denied, 555 U.S. 1105, 129 S.Ct. 904, 173 L.Ed.2d 120
(2009).  Neither when addressing the
trial court about whether Appellant had opened the door to admission of the
Cisneros video recordings nor when the State offered the video recordings into
evidence did Appellant make any timely or specific Rule 403 or unfair-prejudice
objections or obtain any rulings thereon from the trial court.  Tex.
R. App. P. 33.1(a); Swain v. State,
181 S.W.3d 359, 365 (Tex.Crim.App. 2005), cert.
denied, 549 U.S. 861, 127 S.Ct. 145, 166 L.Ed.2d 106 (2006).  Thus, Appellant has failed to preserve this
complaint for our review.  Moreover, because
we find the trial court neither erred nor abused its discretion in admitting
the Cisneros video recordings into evidence, we need not conduct a harm
analysis.  Issue Nine is overruled.

Exclusion of Testimony

            In Issue Ten,
Appellant complains that the trial court erred by excluding the testimony of Michael
Gibson.  We disagree.

            During
defense counsel’s cross-examination, Hamm testified, without objection, that
Appellant had informed him that the attorney for the club had advised that a
patron could legally masturbate in a private room if there was no contact
between the patron and the dancer.  Over
the State’s objection, defense counsel elicited essentially the same testimony
from Crum.  Crum later testified on
re-direct examination by the State that, in his opinion, condoms were used for
sex and not for masturbation.

            Before the
defense rested, and outside the presence of the jury, Appellant proffered the
testimony of attorney Gibson, who testified that he had advised Appellant and
Woodall that if a patron masturbated in a private room at the Naked Harem
during a private dance, the offense of public lewdness would not have been
committed “as long as it was not done for commercial pay.”  Defense counsel then sought to call Gibson
“for the masturbation issue, what he had advised them,” but proffered no theory
of the relevance of such testimony.  Defense
counsel did not respond to the trial court’s inquiry about how Gibson’s
“masturbation” testimony was relevant to the charge of prostitution, and the
trial court sustained the State’s relevancy objection to Gibson’s testimony.

            On appeal,
Appellant contends that Gibson’s testimony was relevant because it would have
tended to provide a legitimate reason or explanation for the presence of the
condom machine at the Naked Harem as well as to why the discovery of used
condoms in the private rooms would not have placed Appellant on notice that the
dancers and patrons were having sex in the private rooms.  According to Appellant, Gibson’s testimony
was critical to her defensive theory that she lacked knowledge of prostitution
in the club and that the exclusion of such testimony both deprived her of her
right to present a defense and was harmful.

            When a party
argues one theory of relevance or admissibility at trial and then argues a
different theory of relevance or admissibility on appeal, no error has been
preserved.  See Johnson v. State, 181 S.W.3d 760, 762-63 (Tex.App.–Waco 2005,
pet. ref’d) (where defendant argued at trial that excluded evidence was
relevant and admissible to show previous relationship between defendant and
victim but argued on appeal that the evidence was relevant and admissible to
show victim was first aggressor, error was not preserved for appellate review).

            Appellant’s
failure to proffer any theory of relevance or admissibility regarding Gibson’s
excluded testimony at trial does not afford her the opportunity to do so on
appeal.  See Johnson, 181 S.W.3d at 762-63. 
As a consequence, Appellant has failed to preserve this issue for our
review.  Issue Ten is overruled.

CONCLUSION

The trial court’s judgment is affirmed.

 

                                                                        GUADALUPE
RIVERA, Justice

October 17, 2012

 

Before McClure, C.J., Rivera, J., and Antcliff, J.

 

(Publish)











[1]
Appellant’s indictment originally included a fourth count of engaging in
organized criminal activity (Count V), which the State dismissed during
Appellant’s first trial.  After a jury
was unable to reach a unanimous verdict in the first trial as to Counts I-IV,
the trial court granted a mistrial.  The
case before us arises from Appellant’s subsequent trial.





[2]
Hamm, Crum, and all of the dancers and patron witnesses called by the State
were granted transactional immunity from prosecution. 





[3]
We address Appellant’s challenges to this evidence below.

 





[4]
Maria Brooks was named as a member of the combination in Counts II through IV
of Appellant’s indictment.





[5]
At the same time, Coutta filed a motion to suppress video and audio recordings
seized by law enforcement.  The video
recording at issue was not seized by law enforcement but was provided directly
by Cisneros to the State.  Therefore, no
Fourth Amendment issue is presented and Appellant’s suppression motion is
inapplicable to our consideration and analysis of Appellant’s ninth issue.